IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DAVID ARRIAGA SR., | ) | 8:11CV261 |
| | ) | |
| Plaintiff, | ) | MEMORANDUM AND ORDER |
| | ) | ON REVIEW OF THE FINAL DECISION |
| v. | ) | OF THE COMMISSIONER OF THE |
| | ) | SOCIAL SECURITY ADMINISTRATION |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On July 29, 2011, the plaintiff, David Arriaga, Sr., filed a complaint against the defendant, Michael J. Astrue, Commissioner of the Social Security Administration. (ECF No. 1.) Arriaga seeks a review of the Commissioner's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. See 42 U.S.C. §§ 405(g) (providing for judicial review of the Commissioner's final decisions under Title II of the Act). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 10-12.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 18; Def.'s Br., ECF No. 21; Pl.'s Reply Br., ECF No. 22.) I have carefully reviewed these materials, and I find that the case must be remanded to the Commissioner for further proceedings.

## I.   BACKGROUND

On or about October 16, 2007, Arriaga filed an application for disability insurance benefits. (Transcript of Social Security Proceedings (hereinafter "Tr.") at 114.) The application was denied on initial review, (id. at 65, 69-72), and on reconsideration, (id. at 67, 75-78). Arriaga then requested a hearing before an ALJ. (Id. at 81.) The hearing was held on October 19, 2009, (e.g., id. at 28), and, in a decision dated March 16, 2010, the ALJ concluded that Arriaga was not entitled to benefits, (see id. at 14-21). Arriaga requested that the Appeals Council of the Social Security Administration

1

review the ALJ's decision.  (See id. at 7.)  This request was denied, (see id. at 1-3), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Arriaga claimed that he became disabled on April 30, 2007, due to sleep apnea, Crohn's disease, migraines, fibromyalgia, degenerative disc disease, and "carpal tunnel." (Tr. at 135.)  He was born in March 1964.  (E.g., id. at 114.)  He served in the U.S. Air Force from February 14, 1986, to April 30, 2007, (e.g., id. at 192), and he completed two years of college, (id. at 33).  While serving in the Air Force, he worked as an information manager.  (Id. at 136.)

### A.   Medical Evidence[1]

On May 10, 2006, Arriaga visited Lavanya Kodali, M.D., and John O'Brien, M.D., at the Creighton University Medical Center's Division of Gastroenterology.  (Tr. at 216-220.)  Arriaga's complaints were "severe reflux symptoms for the last six months, alternating episodes of diarrhea with constipation, severe cramping epigastric pain as well as lower abdominal cramping pain and pain in the subcostal region on the left side radiating to the back, which typically occurs two to three hours after having his meals." (Id. at 218.)  He reported that his reflux symptoms had become worse during the past six months "to the point that he has them almost all the time," and "at times [he] gets anxious to have his meals because of the pain that follows [them]."  (Id.)  He also complained of "palpitations, heat intolerance, drenching sweats at night," restlessness, early morning joint stiffness, and "cramping pain in his muscles."  (Id.)  Dr. Kodali noted Arriaga's past history included gastroesophageal reflux disease (GERD), Crohn's disease, irritable bowel syndrome, fibromyalgia,

---

[1]  This review of the medical evidence will focus on records dating back to approximately May 2006 and continuing to the date of the hearing before the ALJ.  It emphasizes the records cited by the parties in their briefs, (see Pl.'s Br. at 5-10, ECF No. 18; Def.'s Br. at 2-7, ECF No. 21), and it incorporates many of the records cited in the appendix to Arriaga's brief, (see ECF No. 18-1).  I note that Arriaga's appendix, which provides a chronological listing of Arriaga's appointments, procedures, and diagnoses, has been very helpful to me.

2

internal hemorrhoids with anal fissures and ulcers, and a Nissen laparoscopic fundoplication[2] 13 years ago.  (Id. at 218-219.)  She diagnosed "1. Crohn's disease of the lower intestinal tract for the last eight years," adding that Arriaga "might possibly have an esophageal and upper intestinal Crohn's as well"; "2. [s]evere reflux disease status post Nissen fundoplication"; "3. [p]ossibl[e] peptic ulcer"; 4. possible overactive thyroid; and 5. fibromyalgia.  (Id. at 219-220.)  She also noted that Arriaga "[c]an have reactive arthritis or ankylosing spondylitis with his history of inflammatory bowel disease."  (Id. at 220.)  Dr. Kodali ordered lab tests, biopsies, and a colonoscopy to attempt to rule out various conditions.  (Id. at 220.)

In a letter to Arriaga dated May 26, 2006, Dr. O'Brien described the results of recently-performed tests (i.e., an upper endoscopy, a colonoscopy, and related biopsies).  (Tr. at 215.)  Dr. O'Brien noted that "the upper endoscopy showed incompetence of the Nissen fundoplication," "some irregularity of the junction between the esophagus and the stomach," "some reddening of the mucosa throughout the stomach consistent with a mild gastritis," and "some nonspecific, nonerosive duodenitis." (Id.)  The biopsies were unremarkable, and "[t]he colonoscopy demonstrated some mild redness of the distal portion of the sigmoid colon and the proximal rectum" that was of uncertain clinical significance.  (Id. See also id. at 221-222.)  Dr. O'Brien recommended that Arriaga continue with his acid suppression therapy and noted that "we may want to obtain a small bowel evaluation." (Id.)

Arriaga followed up with Dr. O'Brien on June 14, 2006.  (Tr. at 213.)  After reviewing Arriaga's records and conducting a physical examination, Dr. O'Brien made the following diagnoses: "Crohn's disease, currently controlled with sulfasalazine.  2.  Incompetence of Nissen fundoplication in an individual with recent upper endoscopy evaluation suggestive of Barrett's esophagus (check biopsies) . . . , 3. History of irritable bowel syndrome.  4. Past history of peptic ulcer disease."  (Tr. at 213-214.)  He also noted that Arriaga was "interested in seeing Dr. Mittal (Esophageal Center) with regard to a possible re-do of Nissen fundoplication."  (Id. at 214.)  Dr. O'Brien  recommended

---

[2] Fundoplication refers to the "[s]uture of the fundus of the stomach completely or partially around the gastroesophageal junction to treat gastroesophageal reflux disease." Stedman's Medical Dictionary 777 (28th ed. 2006).

that Arriaga continue with his medication for Crohn's disease, and he observed that a Dr. Egbert planned to have Arriaga see Dr. Mittal at the Esophageal Center.  (Id.)

On July 27, 2006, Arriaga underwent a gastric emptying study and an esophagram.  (Tr. at 233-234.)   Among other things, the emptying study revealed "moderately accelerated liquid emptying" and "accelerated solid emptying."  (Id. at 233.)  The record states, "These findings may be secondary to decreased fundal accommodation or lack of functional stomach fundus due to prior surgical changes."  (Id.)  The esophagram revealed "[p]ostoperative changes of the GE junction consistent [with] fundoplication" and "[r]ight posterolateral indentation of the superior esophagus." (Id. at  234.)

On August 14, 2006, Arriaga visited Sumeet K. Mittal, M.D., with complaints "of recurrent reflux and epigastric discomfort" and a request that he be "considered for a remedial procedure." (Tr. at 226.)  Dr. Mittal performed an "[u]pper endoscopy with biopsy" and "[b]alloon dilation of pylorus,"[3] and he made the following findings.

> There was a normal appearing esophagus; there was a little grade A esophagitis.  There was a 1 cm slip of the fundoplication, narrowing was 1 cm below the squamocolumnar junction.   On the retroflex view there was a symmetrical fundoplication.  The stomach had a large amount of solid food in it.  The pylorus was difficult to cannulate and was balloon dilated to 60 French.

(Id.)

Arriaga underwent an esophageal function study on August 15, 2006.  (Tr. at 229.)  The study yielded the following conclusions:

> Competent LES with good relaxation.  Normal esophageal body function.  Short manometric length is a risk factor for short esophagus.  Low crico pressure with normal UES function.  No evidence of esophageal acid exposure.  High alkaline score may be due to either increased salivation or alkaline reflux.

(Id. at 230.)

As noted previously, Arriaga retired from the United States Air Force on April 30, 2007, and on May 31, 2007, he filed "an informal original disability claim" with the Department of Veterans Affairs.  (Tr. at 192.)

---

[3] The pylorus is "[t]he muscular tissue surrounding and controlling the aboral outlet of the stomach."  Stedman's Medical Dictionary 1610 (28th ed. 2006).

4

On or about August 22, 2007, Arriaga visited James H. Mathisen, Psy.D., with complaints of nightmares and night sweats.  (Tr. at 364.)  Dr. Mathisen found that Arriaga did not meet the criteria for PTSD; "Sleep Disorder due to insomnia, hypersomnia, etc."; anxiety; or "depressive spectrum disorder."  (Id.)  Arriaga did "have a Phase of Life Problem," however, as his wife was "seriously medically ill and he [was] taking care of her."  (Id.)  Dr. Mathisen noted that Arriaga's "Phase of Life Problem is such that he would not require psychotherapy or medication management and [is] not significant enough to interfere with occupational and social functioning."  (Id. at 365.)

In August 2007, Arriaga appeared before a Veteran's Administration examiner for a Compensation and Pension Examination.  (E.g., Tr. at 317.)  He reported the following ailments to the examiner: "Tingling & numbness - bilateral hands, wrists and mid arms"; "Bilateral cramping hands, legs, and feet"; "Rheumatoid arthritis"; "Osteoarthritis/pain bilateral knees"; "Osteoarthritis/pain bilateral shoulder"; "Osteoarthritis spine with burning sensation mid and lower"; "Neck pain"; "Right foot Achilles' heal [sic]"; "Plantar fascitis"; "Bilateral elbows tennis"; "Psoriasis - bilateral elbow"; "Dyshidrosis - bilateral hands and feet"; "Hypertension"; "Heart palpitations/irregular heartbeat"; "sleep disorder (sleep apnea)"; "Reflux (GERD)/Peptic ulcers/Barrett's esophagus/Hiatal hernia surgery"; "internal hemorrhoids"; Crohn's disease/IBS"; "Renal cysts left kidney"; "Stone fragments gall bladder"; "Migraine headaches"; and "Bronchial asthma."  (Id. at 317-318.)  In his brief, Arriaga emphasizes the following aspects of the VA examination.  (See Pl.'s Br. at 7-8.)

First, Arriaga reported to the examiner that he has GI "flareups" approximately twice per month, with each episode lasting for two or three days.  (Id. at 318.)  He added that these flareups are accompanied by "cramping of the legs, feet and hands."  (Id.)  Arriaga also reported that he suffers Crohn's disease flareups twice per month that can last for two or three days.  (Id. at 325.)  The examiner concluded that Arriaga's irritable bowel syndrome and Crohn's disease would cause "[i]ncreased absenteeism" from work.  (Id. at 351.)  The examiner also noted that during the past twelve months, Arriaga's "IBS/Crohn's" caused less than one week of incapacitation.  (Id. at 271-272.)

Next, Arriaga reported that he experiences pain in his neck, lower back, and "midback." (Tr. at 320.)  He said that two or three times per month, this pain flares up for two or three days.  (Id. at

5

321.) He added that the flareups are precipitated by an "overall increase in activity," "over exertion," and "activity such as bending or lifting and twisting." (Id.) Images revealed mild degenerative disc disease at C4-C6 and mild multilevel lumbar degenerative disc disease, (id. at 371-372), and the examiner concluded that these ailments would significantly affect Arriaga's ability to perform his usual occupation, (id. at 348-349).

Arriaga also reported that each week he suffers incapacitating headaches with nausea, photophobia, and phonophobia. (Tr. at 326.) The examiner diagnosed migraine headaches, but concluded that the headaches would not significantly affect Arriaga's ability to perform his usual occupation or his usual daily activities. (Id. at 352.)

Finally, Arriaga reported "generalized muscle aches," joint pain, "some fatigue," "numerous trigger points," and a 1989 diagnosis of fibromyalgia. (Tr. at 352.) The examiner observed right and left sided trigger points, diagnosed fibromyalgia, and concluded that the ailment would significantly affect Arriaga's ability to do his usual occupation by causing "[d]ecreased concentration, [w]eakness or fatigue, [and] [p]ain." (Id. at 354-355.) As a result, Arriaga would have to be "[a]ssigned different duties" at work. (Id. at 355.)

On September 6, 2007, Arriaga underwent "an attended nocturnal study" at the NWIHCS Sleep Disorders Lab in Omaha, Nebraska. (Tr. at 396-397.) Based on the study, N. Dewan, M.D., concluded that Arriaga suffered from moderate obstructive sleep apnea and "Abnormal Sleep Architecture." (Id. at 397. See also id. ("Review of sleep architecture demonstrates severe sleep fragmentation with an arousal index of 41.1 per hour.").) The VA examiner concluded that Arriaga's sleep apnea would not significantly affect his usual occupation or his usual daily activities. (Id. at 351.)

On October 2, 2007, the Department of Veterans Affairs issued a Rating Decision stating that Arriaga's overall or combined service connected disability rating was 100%. (Tr. at 188, 192.) More specifically, Arriaga was given the following ratings for his various conditions:

1.    Obstructive sleep apnea - 50%

2.    Fibromyalgia - 40%

3.    Migraine headaches - 30%

4.      Crohn's disease with irritable bowel syndrome, gastroesophageal reflux disease status post Nissen fundoplication, hiatal hernia, Barrett's esophagus, cholelithiasis, and history of peptic ulcer disease - 30%

5.      Tinnitus - 10%

6.      Right elbow lateral epicondylitis - 10%

7.      Left elbow lateral epicondylitis - 10%

8.      Psoriasis with dyshidrosis - 10%

9.      Right shoulder strain - 10%

10.     Left shoulder strain - 10%

11.     Right knee strain - 10%

12.     Left knee strain - 10%

13.     Cervical degenerative disc disease - 10%

14.     Lumbar degenerative disc disease - 10%

15.     Right Achilles tendonitis - 10%

(Tr. at 192-193.)

On October 18, 2007, Arriaga visited Dr. John M. Tudela "to reestablish care" and renew medications. (Tr. at 381-383.) Dr. Tudela noted that Arriaga's fibromyalgia was "well controlled on Robaxin and Lidocaine patches," but he "has occasional flares of his IBD (Crohn's DZ) as well as chronic fatigue." (Id. at 382.) He renewed Arriaga's fibromyalgia medications, counseled Arriaga "on diet and exercise to be included in regimen," directed Arriaga to "continue PPI" to treat "esophagitis chronic reflux,"and advised Arriaga to follow up in one week to continue his physical examination. (Id. at 383.)

Arriaga returned to Dr. Tudela to complete his examination on October 24, 2007. (Tr. at 377-380.) Arriaga reported that he was "doing okay," but his wife was "sick with autoimmune hepatitis/cirrhosis," and he "feels depressed at times." (Id. at 378.) He added that he "needs referrals to GI for annual follow up on Crohn's and Barrett's" and needs refills on certain medications. (Id.) Dr. Tudela ordered the refills, made the requested referral, and released Arriaga without limitations. (Id. at 379-380.)

On January 21, 2008, Arriaga visited Dr. O'Brien for an "esophagogastroduodenoscopy with biopsy." (Tr. at 414.) The procedure revealed an "[i]rregular Z-line, rule out Barrett esophagus"; "[m]ild erythematous streaks in the antrum of the stomach, rule out mild nonerosive, nonspecific gastritis"; and "[p]aleness of duodenal mucosa, clinical significance uncertain." (Id. at 415.)

On January 23, 2008, a CT scan was made of Arriaga's abdomen and pelvis. (Tr. at 422-423.) The CT scan revealed "[s]light irregularity and thickening of the ileocecal valve and terminal ileum" that "may correlate with [Arriaga's] prior history of Crohn's"; "[s]light thickening of the jejunal wall" that "could be related to nonopacification with contrast"; and a "[r]ight 5 cm exophytic Bosniak type I renal cyst." (Id. at 423.)[4]

Arriaga underwent a colonoscopy on February 7, 2008. (Tr. at 417-418.) The colonoscopy revealed "[i]nflamatory irritation of the anal canal," and Arriaga was directed to use suppositories at bedtime and to follow up with the GI clinic. (Id. at 417-418.)

In a letter to Julia Cuervo, M.D., dated March 18, 2008, Dr. O'Brien discussed the findings of the January 21 endoscopy, the January 23 CT scan, and the February 7 colonoscopy. (Tr. at 442.) Dr. O'Brien noted that Arriaga "states he has very little in the way of symptoms at this point," (id. at 442), and he offered the following "GI Analysis":

1.  Anusitis of which the patient does not complain at this point. The patient drinks coffee approximately three times per week and does not use other substances that would tend to irritate anusitis.

2.  History of Crohn's disease for over a decade. A recent CT scan, on January 23, 2008 was consistent with findings of the small bowel. The patient is currently on medication.

3.  History of gastroesophageal reflux disease and history of incompetent Nissen fundoplication. The patient is current[ly] on esomeprazole (Nexium).

4.  History of irritable bowel syndrome.

5.  History of peptic ulcer disease and antritis, noted on recent upper endoscopy (January 21, 2008) with inactive gastritis noted on biopsy (upper stomach).

---

[4] The renal cyst was later determined to be "a simple cyst without septation, calcification or solid components" that did "not represent carcinoma." (Tr. at 481.)

(Id. at 443.)  Arriaga was directed to continue with his current treatment regimen.  (Id.)

On June 23, 2008, Arriaga followed up with Dr. Cuervo for a "follow-up on recent bloodwork." (Tr. at 475-476.)  Dr. Cuervo wrote that Arriaga's "only current complaint" was joint pain "from his fibromyalgia," but added that his recent tonsillectomy "was complicated by excessive bleeding and pain." (Id. at 476)  She noted that Arriaga's fibromyalgia was under "[d]ecent control" with medication, and she released Arriaga without limitations.  (Id. at 478.)

Arriaga visited Dr. Cuervo on October 2, 2008, for a medication refill.  (Tr. at 471-472.) Arriaga reported that his left leg had been throbbing for the past two months, and that his condition was "worse with ambulation." (Id. at 472.)  He added that he had "an area of numbness in his left upper thigh." (Id.)  Upon examination, Dr. Cuervo noted  "[a]ppreciable numbness over L3/L4 region on the left back and left lower extremity," and she ordered a "lumbrosacral MRI for evaluation." (Id. at 473.)  An MRI performed on November 17, 2008, revealed a normal lumbar spine.  (Id. at 508.)[5]

On February 27, 2009, Arriaga reported to Dr. Adam Vossen for a medical check up.  (Tr. at 492-493.)  Although Arriaga reported "no physical complaints," he expressed concerns "about a lack of libido" and about his wife's chronic illness.  (Id. at 493.)  He explained that he took care of his wife and his four children, and he felt that he was "dealing with the stress of the situation fairly well." (Id. at 493.)  After ruling out other possible causes, Dr. Vossen attributed Arriaga's decrease in sexual interest to "excessive stress and anxiety in association with his wife's illness as well as his significant responsibilities for his family's well-being." (Id. at 495.)  He prescribed medication and directed Arriaga to return for a follow-up in one month.  (Id.)

Arriaga underwent an upper GI endoscopy on April 15, 2009.  (Tr. at 560.)  The procedure revealed an irregular Z-line at the gastroesophageal junction and "[d]iffuse mildly erythematous mucosa with no bleeding . . . in the gastric antrum." (Id.)  A biopsy was taken, and it was recommended that Arriaga "[a]wait pathology results," "[f]ollow an antireflux regimen," and "[c]ontinue present medicines." (Id. at 561.)

---

[5] Dr. Cuervo noted on October 2, 2008, that if the MRI were negative, Arriaga would need an "increased dose" of the medication he had been taking to treat his fibromyalgia.  (Tr. at 473.)

Arriaga visited Dr. Cuervo on April 29, 2009, to review lab work. (Tr. at 482-483.) He noted that his wife had passed away, and he was "still in the middle of the grieving process." (Id. at 483.) Dr. Cuervo described Arriaga's hypertension, fibromyalgia, and insomnia as "controlled," and directed Arriaga to follow up in six months. (Id. at 485.)

On August 26, 2009, Arriaga visited Dr. Cuervo for an evaluation. (Tr. at 535, 537.) Arriaga reported a "3 month history of worsening low back pain," "recent lower abdominal pain," "appreciable blood on the tissue paper when he wipes," and "issues with erectile dysfunction." (Id. at 537.) An examination revealed "[t]enderness to palpation over lumbar spinous processes," and Dr. Cuervo ordered "lumbrosacral and SI joint xrays for evaluation." (Id. at 537-538.) Dr. Cuervo also diagnosed "Crohn's disease with recent abdominal pain" and referred Arriaga to "GI." (Id. at 538.)

## B.    Arriaga's Testimony

During the hearing before the ALJ on October 9, 2009, Arriaga testified that he was 45 years old and had completed "about two years of college." (Tr. at 33.) His wife passed away earlier in the year, and two of his four children were still living at home. (Id. at 35, 53.) He served in the Air Force as an administrator/information manager, maintaining computers and running the local area network. (Id. at 36; see also id. at 136.) He worked at a desk for a few hours each day, but otherwise he spent his time going to offices to replace or repair computers. (Id. at 50.) After 22 years in the Air Force, Arriaga decided to retire because he "just kept on having problems with [his] different ailments, and many times [he] had gone before [his] superior officers." (Id. at 37.)[6] He added that he "wasn't . . . making it to the job because of illness . . . several times a month." (Id. See also id. at 44 (stating that Arriaga missed work two or three times per month before retiring).) After retiring, Arriaga looked for employment in "[o]ffice work, business administration, or information technology," but he did not find any jobs. (Id. at 39.) Eventually, he stopped looking for work because his ailments continued to get worse. (Id. at 40.) More specifically, Arriaga testified that he has "pain all over the body" due to fibromyalgia, (id. at 40), that he suffers "debilitating" migraines two or three times per week that can last "a good two whole days," (id. at 42), and that he

---

[6] I take Arriaga's testimony to mean that his superior officers were concerned about his ability to perform his work.

10

experiences unpredictable bouts of Crohn's that cause him to be "constantly in the bathroom, going to the bathroom, having a lot of cramping, a lot of discomfort," (id. at 43-44).

Arriaga said that he treats his fibromyalgia with a "high does of Lyrica," Lidocane patches, Tylenol, and exercise (i.e., walking for 30 minutes twice per week). (Tr. at 41-42, 46.) The Lyrica reduces Arriaga's pain from an "eight" to a "four" on the "scale of pain," and although it makes him lethargic, it does not affect his attention and concentration. (Id. at 44, 46.) When he suffers a migraine, he takes Midrin. (Id. at 42-43.) He has also attempted to use ice, relaxation, and "being in a quiet, dark room" to treat his migraines. (Id. at 43.) Arriaga has had surgeries to address problems related to his Crohn's. (Id. at 45-46.) He also takes Nexium to control his Crohn's, (id. at 40-41), but the Nexium causes stomach pain, (id. at 46-47). Arriaga stated that a CPAP controls his sleep apnea, but sinus infections prevent him from using the CPAP for approximately six weeks during the winter. (Id. at 47-49.)

### C.   The Vocational Expert's Testimony

The ALJ asked Deborah Determan, a Vocational Expert (VE), to consider "a younger worker with a high school, plus two years of college, education" and past experience as a "manager of computer operations." (Tr. at 57.) The ALJ then inquired whether the VE wished to make changes to Arriaga's work summary. (Id.; see also id. at 210.) Determan testified that based on Arriaga's testimony about his job duties, she "would change that DOT [code] and job title to two different job titles." (Id.) "One would be administrative officer," which is "a skilled occupation in the sedentary exertional work category," and the other "would be computer repairer," which is "a skilled occupation in the medium exertional work category." (Id. at 57-58. See also id. at 61 (describing Arriaga's past work as a "composite job").) The ALJ then asked the VE a hypothetical question "for light exertion." (Id. at 58.) The ALJ said, "If the claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds. Could stand, sit, or walk for six hours in an eight hour day. Could occasionally do postural activities: climb, balance, stoop, kneel, crouch, crawl. And from an environmental standpoint, should avoid concentrated exposure to extreme cold or heat, noise, and vibration. With that functional capacity, could he return to his past jobs as, not the computer repairer, because that's medium, but as an administrative officer?" (Id. at 58.) The VE responded that this job "would be consistent with this hypothetical." (Id.) The ALJ then said, "If I were to add

11

on that he needed to have access to a bathroom for bathroom breaks on an as-needed basis, would that affect his ability to do the administrative assistant job?" (Id. at 58-59.) The VE responded in the negative. (Id. at 59.)

Next, the ALJ asked the VE whether Arriaga could perform his past work if his testimony is considered to be credible. (Tr. at 59.) The VE responded,

> Your honor, based on his testimony, a person would be precluded from past work. The claimant has indicated today that he has migraines two to three times a week and that during that time, he needs to remove himself to a dark, quiet place. He's further indicated that he would also be missing work for other reasons related to his other medical issues. It appears, based on his testimony, that he would not be able to attend work on a regular enough basis to be able to work at a competitive level.

(Id.)

The ALJ then asked the VE to reconsider the first hypothetical question and asked, "[I]f we also looked at other work, a step five analysis, would he have transferable skills to other semi-skilled, light and sedentary work, and could he also performed [sic] a wide range of unskilled light and sedentary work?" (Tr. at 59.) The VE responded affirmatively, and later testified that the person described in the hypothetical "could perform the full range of work in the unskilled sedentary level" and "could perform at least 75% of the unskilled occupations" at the light level. (Id. at 59-60.) The VE added that there are approximately 4,000 "administrative officer computer jobs" in the State of Nebraska and approximately 700,000 such jobs in the United States. (Id. at 60.)

In response to questions from Arriaga's attorney, the VE testified that if a claimant with the limitations described in the ALJ's first hypothetical also suffered from the fibromyalgia pain described in Arriaga's testimony, the claimant would be precluded from competitive employment if he were unable "to maintain consistent persistence and concentration in light of that pain." (Tr. at 62.) The VE also testified that if a claimant with the limitations described in the ALJ's first hypothetical also missed work two to three times per month at unpredictable times due to Crohn's, he would be "kind of right on the line" of employability. (Id.) The VE explained, "It's my opinion that if a person is missing two days a month, that . . . the combination of their vacation time and sick time would generally cover that. If a person's missing . . . three or more days a month, then they're likely not at a competitive level. They're missing too much work." (Id. at 62-63.)

12

### D.   The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a).  The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five.  See id.  In this case, the ALJ found Arriaga to be not disabled at step four, but she also made "alternative findings for step five of the sequential evaluation process."  (See Tr. at 19-20.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See id.  In the instant case, the ALJ found that Arriaga "has not engaged in substantial gainful activity since April 30, 2007, the alleged onset date."  (Tr. at 16 (citation omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c).  Here, the ALJ found that Arriaga "has the following severe impairments: inflammatory bowel disease/ Crohn's disease, GERD, sleep apnea, fibromyalgia, arthritis and degenerative disc disease of the cervical spine."  (Tr. at 16 (citation omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If a

13

claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a). In this case the ALJ found that Arriaga "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 16 (citations omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[7] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ concluded that Arriaga "has the residual functional capacity to occasionally lift and carry up to 20 pounds and 10 pounds frequently"; to "occasionally bend, stoop, kneel, crouch and crawl"; and to "stand, sit and walk for up to 6 hours in an 8 hour workday"; but "[h]e needs to avoid concentrated exposure to extreme cold, extreme heat, noise and vibration and needs ready access to a bathroom." (Tr. at 16.) The ALJ added, "The claimant is capable of performing past relevant work as an administrative officer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. In Nebraska there or [sic] 4,000 administrative officer jobs and in the National Economy there are 700,000 administrative officer jobs." (Id. at 19 (citation omitted).) Although the ALJ found that Arriaga was not disabled at step four, she proceeded to step five of the sequential analysis. (See id. at 19-20.)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 404.1520(a)(4)(v), (g).[8] If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See

---

[7] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

[8] "Through step four of this analysis, the claimant has the burden of showing that she is disabled." Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008). After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform." Id.

20 C.F.R. § 404.1520(a)(4)(v), (g).  In this case, the ALJ found that Arriaga "has . . . acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy."  (Tr. at 20.)  She added,

> The vocational expert was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which requires skills acquired in the claimant's past relevant work but no additional skills.  The vocational expert responded and testified that the claimant could perform the full range of unskilled, sedentary work and at least 75% of unskilled, light work.

(Id.)


### III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."  Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error."  Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

15

## IV.    ANALYSIS

Arriaga argues that the Commissioner's decision must be reversed because 1) "The ALJ failed to explain the consideration given to the VA's finding that Mr. Arriaga is 100% service connected disabled due to his medical conditions"; 2) "The ALJ's decision regarding Mr. Arriaga's residual functional capacity is not supported by substantial evidence"; 3) "The ALJ's hypothetical questions must include all impairments supported by the record for the vocational expert testimony to constitute substantial evidence"; 4) "The ALJ's finding that Mr. Arriaga can perform his past relevant work or other work in the national economy is not supported by substantial evidence"; and 5) "The ALJ failed to analyze Mr. Arriaga's credibility pursuant to Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) and SSR 96-7p." (Pl.'s Br. at 13, 16, 21, 23, 26, ECF No. 18.)  I shall analyze each of Arriaga's arguments in turn.

### A.    Whether the ALJ Properly Considered the VA's Rating Decision

Arriaga argues first that the ALJ erred by failing to give "proper consideration to the Rating Decision issued by the VA regarding [Arriaga's] service connected conditions."  (Pl.'s Br. at 13, ECF No. 18.)

It is well-established that disability decisions made by other government agencies (such as the VA) are not binding on the Social Security Administration.  See, e.g., 20 C.F.R. § 404.1504; Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006).  Nevertheless, a government agency's decision that a claimant is disabled is "evidence" that must be considered by the Commissioner.  See 20 C.F.R. § 1512(b)(5); SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006).  Moreover, the ALJ "should explain the consideration given to [decisions by other agencies] in the notice of decision for hearing cases."  SSR 06-03p, 2006 WL 2329939, at *7.  See also Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998) ("We agree with other courts that findings of disability by other federal agencies, even though they are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision. . . .  If the ALJ was going to reject the VA's finding, reasons should have been given, to enable a reasoned review by the courts.").  The ALJ need not discuss the specific disability rating assigned by the other agency, however, if the ALJ fully considers and discusses the medical evidence underlying that rating.  Pelkey, 433 F.3d at 579-80.

16

In the instant case, the ALJ noted that on October 2, 2007, the Department of Veterans Affairs issued a Rating Decision that summarizes Arriaga's medical history and assigns specific disability ratings for Arriaga's "various conditions." (Tr. at 17-18.) After listing fourteen of the fifteen positive disability ratings,[9] the ALJ wrote,

> While this Rating Decision has been carefully reviewed and considered, it is noted that the undersigned is not bound by the determinations of the VA and different Regulations and definitions apply when determining disability pursuant to the Social Security Act, as amended. As stressed at the hearing, Social Security uses a 5-step sequential evaluation, rather than rating separate impairments. It is possible for a Veteran to have impairments which cumulate over 100%, as in the present claim.

(Id. at 18.)

Arriaga argues that it is not sufficient for an ALJ to merely list the ratings assessed by the VA and declare that the VA's findings are not binding. (Pl.'s Br. at 15, ECF No. 18.) Instead, the ALJ should have "addressed the underlying medical evidence that led to the VA's finding that [Arriaga] is disabled." (Id.) I agree with Arriaga.

The VA thoroughly examined Arriaga, and the VA examiner reached several conclusions that are relevant to the Commissioner's disability determination. For example, the VA examiner concluded that Arriaga's irritable bowel syndrome and Crohn's disease would cause "[i]ncreased absenteeism from work," and Arriaga's fibromyalgia would cause "decreased concentration, weakness or fatigue, and pain" that would significantly affect his "usual occupation." (See Tr. at 318, 325, 351-352, 354-355.) The ALJ did not discuss these conclusions, nor did she discuss the medical evidence underlying them. Apparently, the ALJ discounted all of the VA's evidence merely because the VA's decision is not binding on the Commissioner. This was error. The conclusions reached by the VA are entitled to "some weight," and if an ALJ chooses to discount them, she should set forth her reasons for doing so. Morrison, 146 F.3d at 628. The fact that the VA's ultimate disability determination is not binding on the Commissioner does not justify the total disregard of all of the medical examinations and conclusions that supported the VA's decision. See Morrison, 146 F.3d at 628; see also Pelkey, 433 F.3d at 579-80 (explaining that an ALJ does not err in his

---

[9] The ALJ fails to list Arriaga's 10% rating for lumbar degenerative disc disease. (Compare Tr. at 18 with id. at 192-193.)

17

consideration of a VA disability determination if he considers and discusses "the underlying medical evidence contained in the VA's Rating Decision"). Moreover, I cannot say that the ALJ's error was harmless given the VE's testimony that Arriaga would be unemployable if his fibromyalgia rendered him unable "to maintain consistent persistence and concentration in light of [his] pain" and that the absenteeism caused by Arriaga's Crohn's disease would place him "right on the line" of employability. (Tr. at 62.)

The ALJ did state that she "carefully reviewed and considered" the VA's Rating Decision, (Tr. at 18), and the Rating Decision does contain some references to the medical examinations that were conducted by the VA, (see id. at 194-207). The ALJ did not discuss any of these examinations, however, and she did not discuss any of the specific conclusions that the VA drew from them. Instead, she merely recited the percentage ratings assigned by the VA and disregarded them on the ground that they were not binding upon her. In short, the ALJ's decision gives no indication that the Ratings Decision or any of the medical evidence underlying it was, in fact, "carefully reviewed and considered," and it does not explain why the ALJ evidently chose to discount these records. The case must be remanded to the Commissioner for reconsideration.

The Commissioner argues that his decision should be affirmed because the instant case is distinguishable from Morrison. (See Def.'s Br. at 10-11, ECF No. 21.) The Commissioner emphasizes that in Morrison, the ALJ failed to give "explicit attention" to the VA's disability determination, while here the ALJ stated that she "carefully reviewed and considered" the VA's Rating Decision and correctly recognized that the VA's decision is not binding. I agree with the Commissioner that this case is not on all fours with Morrison. Nevertheless, Morrison states clearly that when the record includes extensive medical examinations documenting a claimant's medical problems "followed by a finding of permanent and total disability by another government agency," the ALJ must give reasons for rejecting that agency's finding even though it is not binding. 146 F.3d at 628. An "implicit rejection" of the agency's finding does not suffice. Id. Here, the ALJ acknowledged the existence of the VA's Rating Decision and noted that it is not binding, but she failed to state explicitly that she was giving the decision reduced weight (or no weight), and she failed to state her reasons for doing so. (See Tr. at 18.) These failures prevent me from making "a

18

reasoned review" of the ALJ's decision, <u>Morrison</u>, 146 F.3d at 628, and therefore a remand is required.

The Eighth Circuit's opinion in <u>Pelkey v. Barnhart</u>, 433 F.3d 575 (8th Cir. 2006), is also instructive.  In <u>Pelkey</u>, a claimant argued that the ALJ erred by failing to consider the VA's conclusion that the claimant was 60 percent disabled.  The Eighth Circuit rejected the claimant's argument, stating, "Although he did not specifically mention the 60 percent figure, the ALJ did not err because he <u>fully considered the evidence underlying the VA's final conclusion</u> that Pelkey was 60 percent disabled." 433 F.3d at 579 (emphasis added).  The court also rejected Pelkey's argument that "<u>Morrison</u> compels a different conclusion," stating,

> <u>Morrison</u> held that the <u>ALJ erred in giving no reasons</u> for rejecting a VA rating of 100 percent disability because "an extensive physical examination documenting Morrison's medical problems, followed by a finding of permanent and total disability by another government agency, all of which occupies some thirty pages in the record, merits more than simply an implicit rejection." 146 F.3d at 628.  By contrast, here the ALJ did not ignore the VA rating but considered <u>and discussed the underlying medical evidence contained in the VA's Rating Decision</u>.  The ALJ did not err in his consideration of the VA's disability determination.

433 F.3d at 579-80 (emphasis added).  In Arriaga's case, the ALJ <u>did</u> specifically mention the disability ratings given by the VA, but she did not explain why she disregarded the VA's disability determination, and unlike the ALJ in Pelkey's case, she did not discuss the medical evidence underlying the VA's Rating Decision.  This error must be corrected on remand.

The Commissioner also argues that the ALJ did, in fact, "discuss the objective medical evidence that led to the VA's determination." (Def.'s Br. at 11-13, ECF No. 21.) More specifically, the Commissioner states that ALJ "recognized and discussed all of the diagnoses outlined in the VA's determination" and "listed the findings of the VA regarding Plaintiff's impairments." (<u>Id.</u> at 11.)  It is true that the ALJ listed most of the impairments identified by the VA and their corresponding disability ratings.  (<u>See</u> Tr. at 18.)  She did not, however, "discuss the objective medical evidence" underlying these ratings.  Although the ALJ discussed Arriaga's sleep apnea, fibromyalgia, "digestive diseases," migraine headaches, and other impairments that were noted in the VA's Rating Decision, the discussion does not include any clear references or citations to the

VA's Compensation and Pension Examination or Rating Decision.[10]  Thus, while it is fair to say that the ALJ discussed Arriaga's sleep apnea, fibromyalgia, digestive impairments, and migraines generally, it is not clear that her discussion covers any of the evidence underlying the VA's Rating Decision.  It is clear, however, that the ALJ failed to explain why she apparently chose to discount the medical evidence that supported the VA's disability ratings.

I note in passing that in his brief, the Commissioner strives to link the ALJ's discussion to the medical record, including the records underlying the VA's Rating Decision.  (See Def.'s Br. at 11-13, ECF No. 21.)  The Commissioner's effort to repair the ALJ's written decision is unavailing, however, given the significance of the decision's deficiencies.  Put differently, the Commissioner's post hoc justifications for discounting the VA's evidence do not alter the fact that there is no clear indication that the ALJ properly considered or discussed any of this evidence before she (evidently) rejected the VA's findings.

Finally, the Commissioner suggests that the ALJ may have discussed the VA's findings and evidence when analyzing Arriaga's credibility.  (See Def.'s Br. at 11, 13-15, ECF No. 21.)  I disagree.  As I explained above, the ALJ simply did not explain why she discounted the VE's findings, nor did she discuss the evidence that supported those findings.

In summary, the ALJ did not state explicitly the amount of weight she gave to the VA's Rating Decision.  It appears that she rejected the Rating Decision out-of-hand merely because it was not binding on the Commissioner, but the fact that another government agency's disability determinations are not binding does not mean that they are entitled to no weight.  See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998).  The ALJ was obligated to state reasons for rejecting the

---

[10] The relevant section of the ALJ's decision is nearly devoid of citations to the medical record, save for one "catch-all" citation to "Exhibits 1F through 18F."  (Tr. at 16-19.)  Exhibits 1F through 18F appear on pages 213 to 540 of the transcript and include all of the "Medical Evidence of Record" that was available to the ALJ at the time of her decision.  The VA's Compensation and Pension Examination records are among these exhibits, but the VA's Rating Decision is not.

Arriaga complains that this citation "to the entire medical record" obscures the basis for the ALJ's decision.  (Pl.'s Br. at 13, ECF No. 18.)  I agree that this broad citation is unhelpful given the lack of other more specific citations in the ALJ's decision.

VA's decision "to enable a reasoned review by the courts," id., but she failed to do so.  She also failed to discuss the medical evidence underlying the VA's decision.  See Pelkey v. Barnhart, 433 F.3d 575, 579-80 (8th Cir. 2006).  The VA's Rating Decision and its underlying medical evidence are relevant to the ALJ's RFC determination and to the VE's specific testimony about Arriaga's employability.  Under these circumstances, I must remand this case to the Commissioner for further proceedings.

I shall proceed to review Arriaga's remaining arguments to determine whether the Commissioner must address other matters on remand.

### B.   Whether the ALJ's RFC Assessment Is Supported by Substantial Evidence

Arriaga argues that the case must be remanded because the ALJ erred in formulating his RFC.  More specifically, he argues that the ALJ's RFC assessment is supported only by "non-treating, non-examining physicians' assessments," and these assessments do not constitute substantial evidence "in the face of the conflicting assessment of a treating physician."  (Pl.'s Br. at 18, ECF No. 18.  See also id. at 16-17.)  Arriaga also argues that the RFC assessment is inconsistent with the opinions of the VA examiner, and he claims that Dr. O'Brien's opinions should be given increased weight because he "is a gastroenterologist specialist."  (Id. at 18-20.)

"The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  See also 20 C.F.R. § 404.1545.  Nevertheless, "[b]ecause a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).  When considering the medical evidence, the Commissioner will give a treating source's opinion about the nature and severity of a claimant's impairment "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  See also Renstron v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012).  In addition, "[t]he opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant."  Lacroix v. Barnhart,

465 F.3d 881, 888 (8th Cir. 2006).  See also 20 C.F.R. § 404.1527(c)(1).  Indeed, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  Also, "[t]he Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  Id.

As noted above in Part IV.A., the ALJ failed to specify the weight (if any) that she gave to the VA examiner's conclusions, state valid reasons for discounting those conclusions, and discuss the medical evidence underlying those conclusions.  It is clear that the VA examiner's conclusions and the underlying medical records speak to Arriaga's RFC.  Therefore, if on remand the Commissioner determines that the VA's Rating Decision and medical records are entitled to some weight, he must then reassess Arriaga's RFC in light of that evidence.

It seems to me, however, that the ALJ's RFC assessment is supported by some medical evidence, and I am not persuaded that it is in tension with the opinions of Arriaga's treating physicians.  Arriaga argues that in May 2006, he complained to Dr. O'Brien "of alternating episodes of diarrhea with constipation increasing over the past six months," "severe cramping, epigastric pain," and "lower abdominal cramping radiating to the back."  (Pl.'s Br. at 19, ECF No. 18.)  He adds, "Dr. O'Brien conducted an endoscopy and colonoscopy which confirmed Mr. Arriaga's diagnosis of Crohn's disease, GERD and possibly Barrett's esophagus."  (Id.)  These diagnoses are not in dispute, however, and although it is true that Dr. O'Brien is a specialist in gastroenterology, I do not see how Dr. O'Brien's findings conflict with the ALJ's RFC assessment.  Similarly, Arriaga notes that on October 2, 2008, Dr. Cuervo "made a continued diagnosis of fibromyalgia."  (Id. at 20.)  Again, this diagnosis is not in dispute, and Arriaga has not referred me to any aspect of Dr. Cuervo's opinion that conflicts with the RFC assessment.

In short, although the Commissioner may be required to reassess Arriaga's RFC after giving due consideration to the VA Rating Decision and the medical records underlying it, Arriaga has not shown that ALJ's RFC assessment is in conflict with the opinions of his treating physicians.

### C.     Whether the ALJ's Hypothetical Question to the VE Adequately Incorporated Arriaga's Limitations

Next, Arriaga argues that the ALJ erred by failing to present the VE with a hypothetical question that "mirror[ed] Mr. Arriaga's actual limitations."  (Pl.'s Br. at 21, ECF No. 18.)

"Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (quoting Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994)).  Conversely, "[t]he ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." Id. (quoting Hinchey, 29 F.3d at 432).

The ALJ's failure to address properly the VA's Rating Decision and its underlying medical records calls into doubt the sufficiency of the hypothetical question that she posed to the VE.  For example, the VA examiner concluded that Arriaga's impairments cause concentration problems and absenteeism significant enough to affect his ability to work, and these limitations are not reflected in the ALJ's hypothetical question.  On remand, the Commissioner must first determine the amount of weight to be given to the Ratings Decision and its underlying records.  Then it will be possible to assess whether the question presented to the ALJ encompasses all of Arriaga's limitations that are substantially supported by the record as a whole.

Arriaga argues that the ALJ's hypothetical question also fails to incorporate limitations set forth in his hearing testimony and in the records generated by his treating physicians.  (Pl.'s Br. at 22-23, ECF No. 18.)  Specifically, Arriaga states that the hypothetical should have incorporated: 1) Arriaga's "need[] to go to the restroom after meals and . . . five to six episodes of urgency a day," which is documented in the May 10, 2006, "GI Assessment," (see Pl.'s Br. at 22, ECF No. 18; Tr. at 215-222), and 2) Arriaga's testimony that his fibromyalgia medication "effects [sic] his concentration because it makes him lethargic and sleepy," (Pl.'s Br. at 22, ECF No. 18 (citing Tr. at 46)).  These arguments are not persuasive.  The ALJ's RFC assessment includes the requirement that Arriaga have "ready access to a bathroom," (Tr. at 16), which adequately addresses Arriaga's first point.  As for the second, it is true that Arriaga testified that Lyrica makes him lethargic, but he also responded "no" when asked whether Lidocaine and Lyrica "have any side effects . . . in terms

of [his] attention and concentration and so on." (Tr. at 46.) Thus, I find that the ALJ did not err by failing to incorporate Lyrica's side effects into her hypothetical question.

It remains to be determined whether the ALJ's hypothetical question to the VE ought to have incorporated limitations described in the evidence underlying the VA Rating Decision. In all other respects, however, I find that the ALJ did not err in formulating the hypothetical.

**D. Whether the ALJ's Finding that Arriaga Can Perform His Past Relevant Work or Other Work in the National Economy Is Supported by Substantial Evidence**

Arriaga argues next that the ALJ's step four and step five findings are not supported by substantial evidence. (Pl.'s Br. at 23-26, ECF No. 18.) It is clear that these findings will need to be reconsidered to the extent that the evidence underlying the VA Rating Decision–when properly evaluated and weighed–alters the ALJ's RFC assessment and the hypothetical presented to the VE. (See supra Parts IVA.-C.) That aside, Arriaga makes two additional arguments that merit discussion.

At step four of the sequential analysis, the ALJ concluded that Arriaga retains the RFC to perform his past relevant work. Specifically, the ALJ found that Arriaga has past relevant work as an "administrative officer," concluded that "[t]his work does not require the performance of work related activities precluded by [Arriaga's] residual functional capacity," and stated that there are 4,000 administrative officer jobs in Nebraska and 700,000 administrative officer jobs in the national economy. (Tr. at 19 (citation omitted).) Arriaga notes correctly, however, that his past relevant work was determined to be a "composite" of an "administrative officer" job and a "computer repairer" job, (See Tr. at 57-58, 61), and he argues that it was improper for the ALJ "to bifurcate the job and find [that he] can return to the least demanding component," (Pl.'s Br. at 25, ECF No. 18). I agree.

The Commissioner may use two different tests to determine whether a claimant retains the capacity to perform his past relevant work. See SSR 82-61, 1975-1982 Soc. Sec. Rep. Serv. 836, 1982 WL 13187, at *1-2 (1982). Under the first test, a claimant will be found "not disabled" if he retains the RFC to perform "[t]he actual functional demands and job duties of a particular past relevant job." Id. at *2. Under the second test, a claimant will be found "not disabled" if he retains the RFC to perform "[t]he functional demands and job duties of the occupation as generally required

24

by employers throughout the national economy." Id.  To determine how a job is usually performed in the national economy, the Commissioner may rely on job descriptions appearing in the Dictionary of Occupational Titles (DOT).  Id.  However, composite jobs "have significant elements of two or more occupations and, as such, have no counterpart in the DOT."  Id.  Therefore, when a claimant's past relevant work is considered to be a composite job, the claimant's ability to perform his past job must be "evaluated according to the particular facts of each individual case."  Id.

Although the record clearly establishes that Arriaga's past work was a composite of an administrative officer job and a computer repairer job, the ALJ did not analyze Arriaga's past relevant work as a composite job.  Instead, she proceeded as if Arriaga had past relevant work as an administrative officer and concluded that Arriaga's RFC would allow him to return to this work.  To reach this conclusion, the ALJ did not evaluate the "particular facts" of Arriaga's case, but instead simply disregarded the component of Arriaga's past work that matched the job description of a computer repairer.  This was erroneous, and as a result of this error, the ALJ's finding that Arriaga was able to perform his past relevant work was not properly based on either of the tests set forth in SSR 82-61.[11]  I find, therefore, that the Commissioner's step four finding must be reversed.

In opposition to Arriaga's argument, the Commissioner notes that SSR 82-61 "specifically states that the use of a vocational expert is sufficient to determine how a particular job is usually performed."  (Def.'s Br. at 20, ECF No. 21.)  I take it that the Commissioner means to argue that because the ALJ consulted a VE in this case, his step four finding is supported by substantial

---

[11] The record shows that the "actual functional demands and job duties" of Arriaga's particular job included those of a computer repairer, and the ALJ recognized that Arriaga did not have the RFC to perform such work.  (See Tr. at 58 ("With that functional capacity, could he return to his past jobs as, not the computer repairer, because that's medium, but as an administrative officer?").)  See also SSR 82-61.  Therefore, there was no proper finding that Arriaga was "not disabled" under the first test.  The second test requires the ALJ to determine how a job is usually performed in the national economy, and while "DOT descriptions can be relied upon" to make such determinations "for jobs that are listed in the DOT," SSR 82-61 explains that composite jobs "have no counterpart in the DOT," and therefore an individualized inquiry is necessary to evaluate them.  SSR 82-61 (emphasis added).  Rather than conducting such an inquiry, the erroneously ALJ relied upon the DOT description for administrative officer jobs to determine the requirements of Arriaga's past work.  Thus, there was no proper finding that Arriaga was "not disabled" under the second test.

evidence.  Social Security Ruling 82-61 does state, "For instances where available documentation and vocational resource material are not sufficient to determine how a particular job is usually performed, it may be necessary to utilize the services of a vocational specialist or vocational expert." However, although a vocational expert did testify in this case, the ALJ did not ask the VE how Arriaga's past relevant work was usually performed in the national economy.  Instead, she excised the computer repairer component of Arriaga's composite job from her analysis, declared Arriaga's past relevant work to be an administrative officer job (against the weight of the record), and asked the VE whether Arriaga could return to work as an administrative officer given the limitations set forth in her hypothetical question.  The VE's affirmative response to the ALJ's question did not cure the errors in the ALJ's analysis of Arriaga's composite job.

Arriaga argues that the ALJ also erred at step five by failing to "cite examples of specific occupations that [Arriaga] can perform."  (Pl.'s Br. at 25, 26, ECF No. 18.)  In support of his argument, Arriaga refers me to SSR 83-14, 1983-1991 Soc. Sec. Rep. Serv. 41, 1983 WL 31254, at *6 (1983), which states, "Whenever a vocational resource is used and an individual is found to be not disabled, the determination or decision will include (1) citations of examples of occupations/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country."  The ALJ's decision does not include this information, (see Tr. at 20), and the Commissioner has not responded to Arriaga's claim that this omission requires reversal, (see Def.'s Br. at 18-20, ECF No. 21).  Under the circumstances, and because I have already determined that the case must be remanded, I shall reverse the Commissioner's step five finding.

### E.    Whether the ALJ Properly Analyzed Arriaga's Credibility

Finally, Arriaga argues that his complaints of pain are credible, and the ALJ erred by discounting them.  (Pl.'s Br. at 26-29, ECF No. 18.)

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)).  "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication;

(5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Id. (citation omitted) (alteration in original). The ALJ need not explicitly discuss each of the foregoing factors, however. Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)). "It is sufficient if [the ALJ] acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Id. (quoting Goff, 421 F.3d at 791) (alteration in original). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," courts "will normally defer to the ALJ's credibility determination." Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).

It appears that the ALJ discredited Arriaga's testimony for three primary reasons. First, the ALJ found that the alleged severity of Arriaga's impairments is not supported by the objective medical evidence. (See Tr. at 18-19.) In particular, the ALJ emphasized that Arriaga's sleep apnea has been treated successfully with a "continuous airway pressure machine (CPAP)"; that his Crohn's is controlled with medication; that his migraines are treated with "over-the-counter" medicine and "[h]e has not required prescription medications; and that his fibromyalgia is "controlled." (Id.) Second, the ALJ noted that after Arriaga retired from the Air Force, he "drew unemployment benefits indicating that he was ready, willing and able to work," and "he testified that he applied for work similar to the work he did in the past." (Id. at 19.) Third, the ALJ observed that "with his retirement and VA benefits and unemployment benefits, [Arriaga's] income is not decreased dramatically from his working years." (Id. (citation omitted).) The ALJ also noted that Arriaga "said he retired from the military because his wife was ill and he admirably provided hospice-type care raising their four children," (id.), but I do not see such testimony in the record. On the contrary, Arriaga said that he retired from the Air Force because he was having problems with his ailments. (Id. at 37.)

Proper consideration of the evidence underlying the VA's Rating Decision may alter the analysis of Arriaga's credibility. After careful consideration, however, I find no other error in the ALJ's credibility analysis. Although "an ALJ may not discount a claimant's subjective complaints

solely because the objective medical evidence does not fully support them," <u>Wiese v. Astrue</u>, 552 F.3d 728, 733 (8th Cir. 2009), she may consider "the absence of objective medical evidence to support the claimant's complaints" when assessing her credibility, <u>Moore v. Astrue</u>, 572 F.3d 520, 524 (8th Cir. 2009) (citing, <u>inter alia</u>, <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). It was also appropriate for the ALJ to note that Arriaga's claim for unemployment benefits–which occurred after his alleged onset date–negates his credibility. <u>See</u> <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1074 (8th Cir. 1991).

In conclusion, I find that the ALJ failed to make a proper analysis of the VA Rating Decision and its underlying medical evidence, and she committed errors at step four and step five of the sequential analysis. The case must therefore be remanded to the Commissioner for further proceedings.

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with the memorandum accompanying this order.

Dated September 18, 2012.

BY THE COURT

Warren K. Urbom
United States Senior District Judge

28